UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

JARED R. MOREN,

     Plaintiff,

v.                              Case No.: 8:07-cv-1676-T-17

PROGRESS ENERGY, INC.,

     Defendant.

_____/

## ORDER

This cause is before the Court on Defendant, Progress Energy, Inc.'s, motion for summary judgment (Doc. No. 11), and the Plaintiff, Jared Moren's, response (Doc. No. 20) thereto.

## FACTS

Unless otherwise noted, the facts are taken from the Plaintiff's Response to Defendant's Motion for Summary Judgment (Doc. No. 20) and supporting affidavits and depositions (Doc. Nos. 12-17) for the purpose of resolving the pending motion.

Jared Moren ("Moren"), a white, heterosexual male, was hired by Progress Energy, Inc. ("Progress") as a lineman apprentice in April 2005. He was assigned to the Line Department, located in St. Petersburg, Florida. Jeff Grosseibl ("Grosseibl"), also a white, heterosexual male, was hired as a lineman in September 2005. Grosseibl and Moren worked in the same lineman crew based out of the Line Department. As a lineman, Grosseibl was Moren's superior within the crew. According to Progress's motion, a lineman is also referred to as the apprentice's yard supervisor. However,

Moren's direct management supervisor, from whom Moren took work orders, was Operations Manager Kent Allen ("Allen").

Grosseibl began harassing Moren in December 2005. Specifically, Moren alleges that Grosseibl called him names such as "homosexual," "faggot," "dickeater," "dickcheese," "dildo," "asshole," "dumbass," and "shithead." Grosseibl also frequently asked Moren if he had a "boyfriend named Bruce," and whether he "played with Barbie dolls." Grosseibl also posted signs that read, "Moren is gay," and drew pictures on adhesive notes depicting Moren having sex with another man and with a dog. Grosseibl then posted these sexually explicit depictions on a company truck that lineman used to travel to work-sites. Moren further alleges that on one occasion Grosseibl punched him in his side, and that Grosseibl threatened to nail Moren to a cross and light him on fire. Moren confronted Grosseibl several times and told him to stop. When Grosseibl continued, Moren complained to Allen about the harassment.

In the meantime, Moren's performance evaluations contained constructive criticism suggesting that Moren needed to listen more, talk less, and improve his pole-climbing abilities. On March 3, 2006, Moren met with Allen, Grosseibl, and two other linemen, in Allen's office. During this meeting, Grosseibl and the linemen expressed concern with Moren's work performance, including the issues mentioned in Moren's performance evaluations. Once Grosseibl and the other linemen left Allen's office, Moren, again, complained to Allen about Grosseibl's harassment. Allen assured Moren that he would resolve the problem.

The name-calling continued, however. On March 6, Moren called Progress's Corporate Security department and filed a formal complaint. On March 7, Moren met

2

with and was interviewed by two investigators from the Corporate Security Department. An investigation ensued. Moren was notified the next day that Corporate Security had determined that Grosseibl's conduct was inappropriate. Moren then took vacation leave from March 9 through March 13. The day before returning to work, Moren called Allen to find out the status of the investigation. Allen informed Moren that Grosseibl was fired and that Moren should return to his regular routine.

Moren alleges that soon after he complained to Allen during the March 3 meeting about Grosseibl's boorish conduct, Moren was subjected to retaliation. Specifically, Moren alleges that, on March 7, a District Operations Manager Dereck Roberts and Allen told Moren that he should not have gone "above their heads" to corporate, but that he should have left it to Roberts and Allen to resolve the problem. Moren also alleges that Tom Hanrahan ("Hanrahan"), another lineman that worked in the same crew as Moren and Grosseibl, berated Moren by calling him "the rat" and intimidating him by saying that Moren would get fired because he got a long-time member of the "brotherhood," [1] fired.

On March 21, an altercation ensued between Moren and Hanrahan at a work-site. Hanrahan, a lineman and Moren's superior in the crew, ordered Moren to climb a pole. Moren refused claiming he felt ill. Hanrahan accused Moren of lying about being ill. Moren then climbed down from the pole, at which point Hanrahan and Moren approached each other in a "brisk manner" and came "within inches" of each other before stepping back. But before stepping away, Moren and Hanrahan exchanged words. Moren alleges that Hanrahan again threatened him about interfering with the

---

[1] The "brotherhood" refers to the International Brotherhood of Electrical Workers Union.

union, while Moren allegedly said that he did not care that Hanrahan was a lineman and that he would not grovel at Hanrahan's feet.

When the crew returned to the Line Department, Moren complained to Allen that Hanrahan had harassed him at the work-site. Allen and Roberts conducted an investigation, and subsequently, on March 30, held a meeting with Moren and union representative Todd Fountain ("Fountain"). At this meeting, Moren alleges that Roberts and Fountain pressured him to resign. Specifically, Moren alleges that Fountain told him that if he did not resign, Progress would fire him, and that having a termination on his record would be detrimental to his career. On April 10, upon concluding that Moren had acted inappropriately toward Hanrahan during the altercation, Allen issued Moren a written reprimand, suspended him for three days without pay, and issued him a mandatory referral to Progress's Employee Assistance Program. Moren resigned on April 17, upon return from his suspension.

On or about April 26, Moren filed a complaint with the United States Equal Employment Opportunity Commission ("EEOC"). The EEOC issued Moren a notice of right-to-sue on June 28, 2007. On September 19, 2007, Moren filed a complaint (Doc. No. 1) against Progress bringing three counts: 1) sexual harassment and hostile work environment under Title VII of the Civil Rights Act of 1964 ("Title VII"), section 2000e, United States Code, et seq., and the Florida Civil Rights Act ("FCRA"), section 760.01, Florida Statutes, et seq.; 2) retaliation under Title VII, the FCRA, and the Florida Whistleblower Act, section 448.101, Florida Statutes; and 3) constructive discharge under Title VII and the FCRA. Progress answered (Doc. No 4) thereto on October 17, 2007, and on June 30, 2008, filed a motion for summary judgment (Doc. No. 11). On

4

July 18, 2008, Moren filed a response (Doc. No. 20) to Progress's motion for summary judgment.

## STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(e).  The moving party bears the initial burden of stating the basis for its motion and identifying those portions of the record demonstrating the absence of genuine issues of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323-24 (1986).  That burden can be discharged if the moving party can show the Court that there is "an absence of evidence to support the nonmoving party's case." *Id.* at 323, 325.  When the moving party has discharged its burden, the nonmoving party must then designate specific facts showing that there is a genuine issue of material fact. *Id.* at 324.

Issues of fact are "'genuine' only if a reasonable jury, considering the evidence presented, could find for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). Material facts are those that will affect the outcome of the trial under governing law. *Id.* at 248. In determining whether a material fact exists, the court must consider all the evidence in the light most favorable to the nonmoving party. *Sweat v. Miller Brewing Co.,* 708 F.2d 655 (11th Cir. 1983).

## DISCUSSION

### *Sexual Harassment*

In Count I, Moren brings a claim of hostile work environment based on sexual harassment against Progress under Title VII and the FCRA. Title VII makes it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex . . . ." 42 U.S.C. § 2000e-2(a)(1).

To establish a *prima facie* case of sexual harassment which creates a hostile work environment under Title VII, a plaintiff must show that 1) the plaintiff belongs to a protected group; 2) the plaintiff was subject to unwelcome sexual harassment; 3) the harassment was based on the plaintiff's sex; 4) the harassment was so severe and pervasive that it affected a term, condition or privilege of employment; and 5) there is a basis for employer liability. *Scott v. Pizza Hut of America, Inc.*, 92 F.Supp. 2d 1320, 1323 (M.D. Fla. 2000). For the reasons stated below, we find that a reasonable jury, considering the evidence, could not find that Moren establishes the third element of his hostile work environment claim.

The United States Supreme Court has ruled that a same-sex sexual harassment claim is not excluded under Title VII. *Oncale v. Sundowner Servs., Inc.*, 523 U.S. 75, 79-80 (1998). Moren and Grosseibl are both males. Moren alleges that Grosseibl's sexual harassment created a hostile work environment. Therefore, we find that Moren is a member of a protected class for the purpose of his Title VII claim.

The *gravamen* of any sexual harassment claim is that the alleged sexual harassment was unwelcome "in the sense that the employee did not solicit it or incite it,

6

and in the sense that the employee regarded the conduct as undesirable or offensive."

*Henson v. City of Dundee*, 682 F.2d 897. 903 (11th Cir. 1982) (citations omitted).

Courts may also consider the manner in which the employee registered his complaint.

*See Weinsheimer v. Rockwell International Corp.*, 754 F. Supp. 1559, 1564 (M.D. Fla.

1990), *aff'd*, 949 F.2d 1162 (11th Cir. 1991) (conduct was not "unwelcome" where

plaintiff did not report offensive behavior until months after it happened, and, even then,

only in the course of casual conversation with supervisor).

Progress argues that the harassment was not unwelcome because Moren failed

to register a complaint until about five months after the harassment began. However,

Moren alleges that the harassment began sometime in December 2005, and it is

undisputed that Moren complained to Allen during the March 3, 2006 meeting. At most,

Moren waited a little over three months to make his first complaint.[2] Moreover, we

reject the notion that simply because a victim of offensive behavior waits awhile to

register a complaint, it necessarily means that the victim welcomed the behavior. In fact,

a prudent individual would try to work it out with the offender before taking it to

management, just as Moren seems to have done here.

Progress argues further that the harassment was not unwelcome because Moren

participated in the boorish behavior. Just because Moren challenged the behavior does

not necessarily mean he welcomed it. Moren's alleged "participation" was reasonable,

since no self-respecting person would allow such behavior to go unchallenged.

---

[2] There is a factual dispute as to when Moren first complained to Allen, his direct supervisor, about Grosseibl's harassment. Moren alleges that he complained to Allen on numerous occasions before the March 3 meeting. Allen denies this allegation. This dispute, however, is not material since we find that the harassment was unwelcome.

Therefore, we find that the harassment was unwelcome. Next, we address whether the harassment was because of Moren's gender.

The Supreme Court held in *Oncale* that the critical issue in determining whether the alleged abuse amounts to harassment because of the plaintiff's gender is "whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." *Oncale*, 523 U.S. at 80 (quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993)). It is insufficient to show merely that the "words used have sexual content or connotations." *Id.*

The fact that Grosseibl and Moren are both heterosexual males attenuates the argument that the harassment was because of Moren's gender. Plus, there is no evidence to show that male employees at Progress were treated differently than female employees, or were exposed to disadvantageous conditions to which female employees were not exposed. No such evidence was presented probably because there were no female employees in the linemen crew to serve as points of comparison.

Moreover, in his deposition, Moren testified, "I don't think Mr. Grosseibl thought much of me as a person . . . . He had it out personally against me . . . . He attacked me personally, not against my work." (Moren Deposition at 95, 97-98). Moren also testified that Grosseibl "kind of, like, singled me out. I mean, he went out of his way to take this out on me." (Moren Deposition at 135). Moren also testified that he was called other names that do not have sexual connotations, such as "asshole" and "dumbass." (Moren Deposition at 99). On the other hand, Grosseibl testified, "As a journey lineman, it's my duty to harass the apprentices. That's how line work is. It's a fraternity. You haze them." (Grosseibl Deposition at 6). Grosseibl also testified that his harassment was not

because of his gender. (Grosseibl Deposition at 35). These testimonies suggest anything but that Grosseibl's harassment was because of Moren's gender. Therefore, we find that there is no issue of material fact as to this required element.

Alternatively, Moren also argues, somewhat cryptically, that Grosseibl's harassment was "because of Grosseibl's perception of Moren as a particular kind of man." (Doc. No. 20). We cannot decipher what Moren means here exactly. But, if we were to conjecture, it seems Moren is arguing that the harassment he allegedly suffered qualifies as Title VII sexual harassment because the harassment resulted from stereotypes associated with homosexuality. The Supreme Court has determined that discrimination based on stereotyping could, in certain situations, qualify as discrimination based on sex under Title VII. *Price Waterhouse v. Hopkins*, 490 U.S. 228, 250 (1989) (overruled on other grounds). In *Hopkins*, the partners at Price Waterhouse described Hopkins as:

> "macho," suggested that she "overcompensated for being a woman," advised her to take "a course at charm school," objected to her use of profanity "because it's a lady using foul language," explained that she "ha[d] matured from a tough-talking somewhat masculine hard-nosed [manager] to an authoritative, formidable, but much more appealing lady [partner] candidate," and was told that in order to improve her chances for partnership, she should "walk more femininely, talk more femininely, dress more femininely, wear make-up, have her hair styled, and wear jewelry."

*Id.* at 235.

*Hopkins* is distinguishable from Moren. First, the discrimination in *Hopkins* was based on gender stereotyping, that is, stereotyping based on feminine characteristics that are traditionally associated with women. Hopkins was not perceived as feminine; rather, she was perceived as masculine. The Court stated that "[t]here were clear signs . . . that some of the partners reacted negatively to Hopkins' [masculine]

personality because she was a woman." *Id.* at 235. In light of this analytical framework, a claim under Title VII could be stated if Moren was able to show that the harassment he allegedly suffered was based on his perceived failure to conform to a masculine gender role. Moren, however, cannot.

Moren infers that because Grosseibl called him names and made statements that have homosexual connotations, that he was a victim of sexual harassment based on stereotyping. Although there is no shortage of adjectives to describe Grosseibl's inappropriate behavior toward Moren, the facts before us are insufficient to make such an inference. In order to properly make this inference, Moren would have to show at least that the harassment he allegedly suffered was based on his perceived failure to conform to a masculine gender role. Or, to put it another way, the facts must establish that Moren's behavior at work could indeed be reasonably perceived as feminine, and, therefore, as that of a homosexual. But as stated above, there is nothing to establish such failure on Moren's part. In fact, Grosseibl testified that he knew Moren was not a homosexual and that he knew Moren liked women, which suggests that Moren did not act feminine at work. (Grosseibl Deposition at 135).

Because Moren cannot establish the third required element of his Title VII hostile work environment claim, we do not find it necessary to address the merits of the fourth and fifth elements. Therefore, we grant Progress summary judgment as to Count I.

### *Constructive Discharge*

In Count III, the last count, Moren brings a constructive discharge claim against Progress under Title VII and the FCRA. In order for the plaintiff to prove constructive discharge, he must demonstrate that "[]he involuntarily resigned from h[is] employer to

escape intolerable and illegal employment requirements to which he or she was subjected to because of race, color, religion, sex, or national origin." *See Morgan v. Ford,* 6 F.3d 750, 755 (11th Cir. 1993) (quoting *Henson,* 682 F.2d at 907). Moreover, "[t]he standard for proving constructive discharge is higher than the standard for proving a hostile work environment." *Hipp v. Liberty Nat'l Life Ins. Co.,* 252 F.3d 1208, 1231 (11th Cir. 2001).

We held above that Moren's hostile work environment claim does not survive summary judgment because there was no genuine issue of material fact. A viable Title VII hostile work environment claim is the necessary predicate for Moren's Title VII constructive discharge claim. Therefore, Moren's constructive discharge claim necessarily cannot survive summary judgment.

### *Retaliation*

In Count II, Moren brings a retaliation claim against Progress under Title VII, the FCRA, and the Florida Whistleblower's Act ("FWA"). To establish a *prima facie* case of retaliation under Title VII, the plaintiff must prove that: 1) he participated in an activity that Title VII protects; 2) he suffered an adverse employment action; and 3) there is a causal connection between the participation in the protected activity and the adverse employment decision. *See Hurlbert v. St. Mary's Health Care Sys., Inc.,* 439 F.3d 1286, 1297 (11th Cir. 2006). If the plaintiff establishes a *prima facie* case, the burden then shifts to the defendant to articulate a legitimate reason for the adverse employment action. *Id.* "If the defendant does so, the plaintiff must then show that the defendant's proffered reason for the adverse action is pretextual." *Id.*

## I. Protected Activity

Statutorily-protected activity includes complaining to superiors about alleged sexual harassment and filing complaints with the United States Equal Employment Opportunity Commission. *Johnson v. Booker T. Washington Broad. Serv.,* 234 F.3d 501, 507 (11th Cir. 2000); s*ee also Meeks v. Computer Assocs. Int'l.,* 15 F.3d 1013, 1021 (11th Cir. 1994) (quoting *Tipton v. Canadian Imperial Bank of Commerce,* 872 F.2d 1491, 1494 (11th Cir. 1989)) ("To recover for retaliation, the plaintiff 'need not prove the underlying claim of discrimination which led to her protest,' so long as she had a reasonable good faith belief that the discrimination existed."). Moren engaged in statutorily-protected activity by filing a formal complaint with the Corporate Security Department at Progress, which, in turn, resulted in the termination of Grosseibl. Thus, Moren can meet the first element of his *prima facie* case for retaliation under Title VII.

## II. Adverse Employment Action

The Supreme Court recently addressed the adverse employment action element of a Title VII retaliation claim in *Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53 (2006). In that case, the Court held that "the scope of [Title VII's] anti-retaliation provision extends beyond workplace-related or employment-related retaliatory acts and harm," and, therefore, "is not limited to discriminatory actions that affect the terms and conditions of employment." *Id.* at 63-65. Therefore, "an employee need not show an adverse employment action, but rather, must show that 'a reasonable employee would have found the challenged action materially adverse.'" *Crosby v. Mobile County Personnel Bd.,* 2007 WL 245126, at *4 (11th Cir. January 30, 2007) (quoting *Burlington,* 548 U.S. at 68). In other words, the plaintiff must show that he suffered a materially

adverse action that would dissuade a reasonable employee in the same position from filing his complaint.

Moren alleges that soon after he filed the complaint with the Corporate Security Department, he was subject to retaliation. First, upon return from his paid vacation, District Operations Manager Dereck Roberts and Allen told Moren that he should not have gone "above their heads" to corporate, but that he should have left it to Roberts and Allen to resolve the problem. Second, Hanrahan, a lineman who was ranked above Moren, allegedly berated Moren by calling him "the rat" and threatened him that he was going to get fired for interfering with the "brotherhood." Moren and Hanrahan engaged in an altercation at a work-site during which Hanrahan again threatened Moren that he was going to be fired.

Following the altercation with Hanrahan at the work-site, Moren had a meeting with Allen and Todd Fountain, the union representative. At this meeting, Moren alleges that Fountain told him that if Moren did not resign, Progress would fire him, and that having a termination on his record would be detrimental to his career. Progress, perhaps rightly, argues that each of these actions taken against Moren do not amount to materially adverse actions. However, we find that the episodes, strung together and viewed as a whole within the broad boundaries set by the Supreme Court in *Burlington*, amount to materially adverse actions. Lastly, Allen issued a written reprimand against Moren and suspended him for three days without pay. Progress does not dispute that the suspension constitutes a materially adverse employment action.

Construing the facts in the light most favorable to Moren, and considering the totality of the circumstances, we find that Moren could show that the materially adverse

actions discussed above would dissuade a reasonable employee in the same position from filing a complaint of harassment. Therefore, Moren can meet the second element of his *prima facie* case for retaliation under Title VII.

## III. Causal Connection

To establish a causal connection between Plaintiff's participation in a protected activity and Defendant's adverse employment action, Plaintiff must show that the "decision-maker[s] [were] aware of the protected conduct," and "that the protected activity and the adverse action were not wholly unrelated. *Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1337 (11th Cir. 1999) (citations omitted). For the purposes of establishing a *prima facie* case, "close temporal proximity" may be sufficient to show that the protected activity and the adverse action were not "wholly unrelated." *Id.*

It is undisputed that Progress was aware he filed a complaint with Allen and with the Corporate Security Department. Moreover, Moren's complaint to the Corporate Security Department and the materially adverse actions that followed are temporally proximate and not wholly unrelated. Therefore, we find that Moren has established a *prima facie* retaliation claim under Title VII.

## IV. Non-Retaliatory Reasons and Pretext

Once the plaintiff can establish a *prima facie* case, the defendant must then show a non-retaliatory reason for terminating plaintiff's employment. If this is satisfied by the defendant, the plaintiff must then show the non-retaliatory reason proffered by defendant is pretextual. *Chambers v. Walt Disney World Co.*, 132 F.Supp. 2d 1356, 1368 (M.D. Fla. 2001). In other words, if Progress articulates a legitimate non-retaliatory

reason for its materially adverse actions, Moren must show that the stated reason is an attempt to cover Progress's true retaliatory intentions.

Progress argues that the three-day suspension without pay was a disciplinary action taken in response to the altercation Moren had with Hanrahan, in which Moren was at fault. Therefore, Progress argues, the three-day suspension was non-retaliatory. Progress asserts that Moren disobeyed Hanrahan's order to climb the pole, aggressively approached Hanrahan, and verbally disrespected Hanrahan's authority. Moren alleges that he told Hanrahan that he could not continue climbing up the pole because he felt ill. Given that Hanrahan was close friends with Grosseibl, and the fact that Hanrahan berated and threatened Moren after Grosseibl was fired, we find it reasonable for a trier-of-fact to find that Hanrahan ordered, and yelled at, Moren to climb the pole out of retaliatory intent. Moreover, according to both Moren's and Grosseibl's depositions, it is clear that safety was of a paramount concern at Progress. The factual issue remains, therefore, that if Moren was not responsible for getting Grosseibl fired, would Hanrahan have ordered Moren to continue climbing the pole even after Moren told him he was feeling ill?

Furthermore, in regard to the altercation that ensued between Moren and Hanrahan, although Progress argues in its argument section of its motion that Moren approached Hanrahan in an aggressive manner, Progress states in the facts section that Moren and Hanrahan "*approached each other* in a 'brisk manner' and came 'within inches' of each other before stepping back." (emphasis added). If the altercation ensued as a result of mutual incitement, it appears perhaps that Moren was not the only one to blame. Only Moren, however, was disciplined. Therefore, a fact-finder must

clarify the ambiguity, resolve the factual disputes surrounding the altercation, and determine whether the suspension was non-retaliatory.

Lastly, there is also an issue as to whether Progress would indeed have fired Moren if he did not resign. Moren alleges that Todd Fountain, the union representative, told him that, if he did not resign, Progress would fire him. Fountain also intimated that given Moren's young age, having such a negative employment record would be detrimental for Moren's career. The question, then, arises, how did Fountain know that Progress would fire Moren if Moren did not voluntarily resign? Did Progress ask Fountain to pressure Moren to resign to protect itself from employment liability? If so, was Progress's decision to fire Moren influenced in any way by Moren's complaint to Corporate Security? Or, another question that arises is, did Fountain, on behalf of the union, want Moren fired for getting a member of the "brotherhood" fired?

Given the totality of the circumstances between March 7, 2006, when Moren registered the complaint with the Corporate Security Department, and April 10, 2006, when Moren was suspended without pay, we find that Progress has not met its burden of showing that the adverse employment actions were legitimate and non-retaliatory. But even if Progress's stated reasons are sufficiently non-retaliatory, the uncertainty surrounding that time period, including the altercation and the meeting with Fountain, sufficiently raises the specter of pretext. Thus, we find that there are genuine issues of material fact to be weighed by the trier-of-fact. Therefore, summary judgment is not proper for Moren's claim of retaliatory discharge under Title VII.

With respect to Moren's retaliation claim under the Florida Whistleblower's Act ("FWA"), section 448.101, Florida Statutes, a plaintiff alleging a violation of the FWA

must establish the same three elements that are required to establish a *prima facie* case of unlawful retaliation under Title VII. *Sierminski v. Transouth Financial Corp.*, 216 F.3d 945, 950 (11th Cir. 2000).   However, unlike Title VII's unlawful retaliation provisions, the FWA requires the plaintiff to actually prove a violation of a law, rule, or regulation in order to succeed. *White v. Purdue Pharma, Inc.*, 369 F. Supp. 2d 1335, 1337-39 (M.D. Fla. 2005) (construing the FWA to require an actual violation of a law, rule, or regulation). Because Moren's Title VII hostile work environment and constructive discharge claims cannot survive summary judgment, there is no underlying violation of a law, rule, or regulation that supports his claim under the FWA.

### *Florida Civil Rights Act*

Florida courts have held that decisions construing Title VII are applicable when considering the Florida Civil Rights Act ("FCRA"), section 760.01, Florida Statutes, because the Act was patterned after Title VII. *Harper v. Blockbuster Entertainment,* 139 F.3d 1385, 1387 (11th Cir. 1998) (citing *Ranger Ins. Co. v. Bal Harbour Club, Inc.,* 549 So.2d 1005, 1009 (Fla. 1989)).   "No Florida court has interpreted the [Florida Civil Rights Act] to impose substantive liability where Title VII does not." *Id.* Therefore, for the same reasons that Moren's claims for hostile work environment and constructive discharge fail under Title VII, the claims also fail under the FCRA. However, since Moren's claim for retaliation under Title VII survives summary judgment, his retaliation claim under the FCRA also survives.

### CONCLUSION

Moren fails to establish his claim for hostile work environment based on sexual harassment under Title VII and the FCRA. The facts clearly establish that no reasonable

jury would find that the harassment Moren endured was because of his gender. Nor could any reasonable jury find that the harassment was because of stereotyping. Consequently, we find that Moren necessarily fails to establish his Title VII and FCRA constructive discharge claim. Lastly, we find that because there exists genuine issues of material facts with regard to Moren's retaliation claim under Title VII, the FCRA, and the FWA, a reasonable jury could find that Progress's materially adverse actions was in retaliation to Moren's filing his complaint with the Corporate Security Department. Accordingly, it is:

ORDERED that the Defendant, Progress Energy, Inc.'s, motion for summary judgment (Doc. No. 11) is GRANTED as to Count I and III, and DENIED as to Count II, of the Plaintiff, Jared Moren's, complaint (Doc. No. 1).

DONE AND ORDERED in Chambers, in Tampa, Florida, this _7th_ day of August, 2008.

ELIZABETH A. KOVACHEVICH
United States District Judge

cc: All Parties and Counsel of Record